[Docket No. 1]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

THERESA PFISTER STOCKETT,

    Plaintiff,

       v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Civil No. 15-7692 (RMB)

**MEMORANDUM ORDER**

**BUMB**, UNITED STATES DISTRICT JUDGE:

This matter comes before the Court upon the appeal by
Plaintiff Theresa Pfister Stockett (the "Plaintiff") of the
final determination of the Commissioner of Social Security (the
"Commissioner") denying Plaintiff's application for social
security benefits [Docket No. 1].  For the reasons set forth
below, the Court **VACATES** the decision of the Administrative Law
Judge (the "ALJ") and **REMANDS** for further proceedings.  As
further proceedings are necessary to fully develop the record,
Plaintiff's request for summary judgment in Plaintiff's favor
[Docket No. 8, at p. 24-25] is denied.

The Court finds as follows:

1.  Plaintiff applied for social security disability
benefits on November 16, 2011, alleging an onset date of

April 24, 2011 [Administrative Record ("R.") 83-108].  The claim was denied initially on June 9, 2012, and upon reconsideration on January 18, 2013 [R. 109-13, 119-21].  On February 18, 2013, Plaintiff requested a hearing before an ALJ [R. 122-23].  On April 15, 2014, ALJ Joseph M. Hillegas held a hearing, at which Plaintiff appeared with her attorney, Laura Petruzzelli, and provided testimony [R. 44-75].  Vocational expert Gary Young also testified [R. 76-81].  The ALJ issued an unfavorable decision on June 25, 2014, in which he found that Plaintiff was not disabled because she is able to perform her past relevant work as generally performed or, alternatively, she is able to perform other jobs that exist in the national economy [R. 18-36].  On September 23, 2015, the Appeals Council denied Plaintiff's request for review of the ALJ's decision [R. 1-6], making the ALJ's decision the final determination of the Commissioner.

2.   Plaintiff alleges that she suffers from disabling neck and back pain, in addition to tingling and numbness in her extremities, as a result of a work injury sustained on November 12, 2010 and an April 16, 2011 motor vehicle accident. Plaintiff also claims that she regularly suffers from headaches and migraines, as well as tingling and numbness in her hands that impede her ability to handle, finger, and feel.

**THE ALJ'S DECISION**

3.    The ALJ found that Plaintiff suffers from the
following severe impairments: discogenic and degenerative
disorders of the cervical and lumbar spine [R. 20].  The ALJ
found, however, that Plaintiff's alleged anxiety and depression
did not limit Plaintiff's ability to perform basic work-related
activities [R. 21].

4.    At the suggestion of Plaintiff's counsel, the ALJ
considered whether Plaintiff suffered from an impairment or
combination of impairments that meets or medically equals the
severity of Listing Level 1.04A.  See 20 C.F.R. Part 404,
Subpart P, Appendix 1.  The ALJ found that Plaintiff's
impairments did not meet Listing 1.04A [R. 29].

5.    The ALJ next determined that Plaintiff had the
residual functional capacity ("RFC") "to perform light work as
defined in 20 CFR 404.1567(b) except she is limited with
overhead reaching."  [R. 29].

6.    The ALJ then determined that Plaintiff is capable of
performing her past relevant work as a food products sales
representative as generally performed [R. 34].  Alternatively,
the ALJ found that there are other jobs that exist in the
national economy that Plaintiff is able to perform [R. 35].  For
these reasons, the ALJ determined that Plaintiff is not
disabled.

**PLAINTIFF'S MEDICAL HISTORY**

7.   A May 21, 2010 MRI of Plaintiff's cervical spine revealed a broad-based annular bulge with a superimposed central protrusion at C5-C6, resulting in mild canal stenosis with mild deformity of the cord.  Additionally, at C6-C7, there is central disc protrusion and mild canal stenosis.  [R. 288, 544].  The MRI of Plaintiff's lumbar spine revealed a broad-based disc bulging at L3-4 with annular tear.  [R. 289, 542].

8.   On June 10, 2010, Plaintiff was examined by Dr. Orin Atlas.  Plaintiff reported increasing pain over the course of three weeks after slipping at home due to severe pain in her back and radiating down her left leg.  Dr. Atlas reported decreased range of motion in Plaintiff's cervical spine.  An MRI of Plaintiff's cervical spine "reveal[ed] evidence of moderate-sized C5-6 HNP [herniated nucleus pulposus] with some moderate spinal cord compression, and MRI of her lumbar spine shows evidence of some L3-4 degenerative disk disease with mild foraminal stenosis."  He noted "cervical HNP and moderate spinal stenosis and lumbar radiculopathy."  [R. 287].

9.   On July 7, 2010, Dr. Atlas examined Plaintiff and noted that she had been doing well until she colored her hair, which caused her symptoms to return.  She reported numbness in her left arm and hand.  Dr. Atlas prescribed Ultracet and

4

referred Plaintiff to Dr. Gupta for a cervical epidural steroid injection.  [R. 282].

10.  On August 18, 2010, Plaintiff was examined by Dr. Rakesh Gupta, who noted a history of neck pain, as well as numbness and tingling in Plaintiff's left upper extremity.  He found that Plaintiff suffered from cervical radiculopathy. [R. 272].  The next day, Dr. Gupta performed a C6/7 transflaval epidural steroid injection on Plaintiff and diagnosed Plaintiff with left cervical radiculopathy.  [R. 276].

11.  On August 20, 2010, Dr. Atlas examined Plaintiff and noted that, although she had her second epidural steroid injection the day before, she reported persistent symptoms.  He prescribed her Vicodin for pain, but noted that "in terms of back, she is doing great."  [R. 281].

12.  On September 1, 2010, Plaintiff's physical therapist, Christen Walker, wrote to Dr. Atlas explaining that Plaintiff continued to complain of cervical and lumbar pain.  [R. 280].

13.  On September 15, 2010, Plaintiff visited Dr. Atlas for a follow up after a trip to Alaska.  Dr. Atlas noted that she reported pain radiating to her left arm.  He also noted that "she will return to work," but that if her symptoms were to increase, she should see him again for further recommendations. [R. 279].

14.  On November 12, 2010, Plaintiff was involved in an accident at work, during which she hyperextended her arms and suffered immediate pain, diminished grip, and tinnitus.  [R. 314].  She presented at Concentra Medical Center, where she complained of "sharp, burning pain and numbness in her neck, [right] arm, and [right] hand."  [R. 331].  Dr. Frank Wilczynski found that she suffered from cervical radiculopathy and cervical strain, and limited Plaintiff to lifting no more than ten pounds and no reaching above shoulders [R. 333].  Plaintiff returned to Concentra for a follow up several days later, reporting that she still had pain and numbness [R. 335].

15.  On November 23, 2010, Plaintiff again returned to Concentra for a checkup after her work accident.  She reported shoulder pain when lifting items and that she had trouble with her fingers when trying to grasp anything.  Otherwise, Plaintiff reported feeling better.  Dr. Wilczynski found her range of motion to be limited.  He noted cervical radiculopathy and instructed Plaintiff to limit her lifting to no more than twenty pounds and to perform no overhead reaching.  [R. 338-39].  In the following weeks, Plaintiff reported an improvement in her symptoms.  Dr. Wilczynski continued Plaintiff's work restrictions.  [R. 340-46].

16.  A December 1, 2010 MRI of Plaintiff's cervical spine showed degenerative disc disease, disc herniation, disc bulge

encroaching upon the anterior thecal sac, and "likely
encroachment upon the right C7 nerve." [R. 540-41].

17.   On December 16, 2010, Dr. Charu Gupta examined
Plaintiff.  Dr. Gupta diagnosed Plaintiff with neuralgia,
neuritis, radiculitis, and cervical strain, and restricted
Plaintiff to lifting no more than twenty pounds and no reaching
or lifting above her shoulders.  [R. 585].

18.   On December 28, 2010, Plaintiff was seen by Dr. Stuart
Maslin.  Plaintiff reported that her symptoms were not better
and that she was still dropping things.  Dr. Maslin continued
her work restrictions of no lifting over twenty pounds and no
reaching above her shoulders.  [R. 349-50, 581].

19.   On January 12, 2011, Dr. Jeffrey Polcer examined
Plaintiff for an initial office evaluation.  Plaintiff reported
neck pain and intermittent numbness and tingling in both upper
extremities.  Dr. Polcer found that she suffered from cervical
radiculopathy and suggested a cervical epidural steroid
injection.  He continued her workplace restrictions of lifting
no more than twenty pounds and no reaching above shoulder level.
[R. 324-25].

20.   On January 24, 2011, Dr. Polcer noted Plaintiff's
admitting diagnosis was cervical radiculopathy and proposed a
cervical epidural injection [R. 291, 295].  Two days later,
Dr. Polcer performed the procedure and his postoperative

diagnosis remained cervical radiculopathy [R. 297].  The PACU
records state that Plaintiff reported that her left hand fingers
get numb [R. 303].

21.  On February 9, 2011, Plaintiff visited Dr. Polcer
after her cervical epidural steroid injection.  She reported
feeling significantly better, but that she still had numbness in
her hands.  Dr. Polcer stated that he "really cannot explain
these symptoms based on her MRI" and that further testing was
required "to determine whether or not there is any true
pathology."  He restricted her to lifting no more than twenty
pounds and no overhead lifting.  [R. 323].

22.  On February 13, 2011, Dr. William Anthony performed an
EMG/nerve conduction study on Plaintiff.  Plaintiff complained
of parasthesias and "a variable sense of weakness in the hands."
The EMG results were normal and Dr. Anthony noted no evidence of
acute or chronic denervation or acute or chronic cervical
radiculopathy.  [R. 318, 320].

23.  On March 1, 2011, Dr. Joan O'Shea, an orthopedic spine
specialist, examined Plaintiff.  Plaintiff complained of neck
and arm pain.  Dr. O'Shea noted that Plaintiff's range of motion
in her wrists, hips, and knees was normal, but that she had
significantly decreased cervical extension and decreased right
shoulder range of motion.  She suggested continued epidural

steroid injections and opined that Plaintiff could work on light duty with no lifting greater than thirty pounds. [R. 314-17].

24. On March 2, 2011, Dr. Polcer examined Plaintiff. He noted that she had "reached maximum medical improvement" and could return to work full duty, but advised that she should look for another job that requires less repetitive stress to the neck by working overhead. [R. 322].

25. On April 17, 2011, Plaintiff was in a motor vehicle accident. The following day, she was evaluated by Dr. Wilczynski, who diagnosed her with lumbosacral and cervical strain and found that Plaintiff could return to work with no restrictions. [R. 351-53]. On April 27, 2011, Plaintiff was reevaluated and complained that her symptoms were worsening. Dr. Wilczynski diagnosed her with cervical radiculopathy and cervical and lumbar strain. [R. 356-57]. The following week, Plaintiff complained that she was unable to use her computer mouse due to pain. Plaintiff's assessment remained the same. [R. 359-60]. The next week, Plaintiff's straight leg raise test was positive on the left side in a seated position. Dr. Wilczynski limited Plaintiff to lifting no more than ten pounds and no reaching above shoulders. [R. 362-63].

26. On May 18, 2011, Plaintiff was examined by Dr. Maslin, who diagnosed her with neuralgia, neuritis, radiculitis, lumbosacral sprain, and neck sprain. He restricted her to

lifting no more than ten pounds and no reaching above her shoulders.  [R. 576].

27.  On May 23, 2011, Plaintiff obtained MRIs of her lumbar spine and cervical spine.  The lumbar spine MRI showed "L3-L4 annular bulging most prominent left paramedianly impinging upon the thecal sac with left paracentral annular tear" and "L4-L5 annular bulging abutting the thecal sac."  The cervical spine MRI evidenced "C2-C3 and C3-C4 small central protruding herniations effacing the thecal sac, C4-C5 mild annular bulging effacing the thecal sac," "C5-C6 annular bulging with superimposed shallow right paramedian protruding herniation impinging upon the cervical cord[,] [m]oderate narrowing of the central canal and neural foramina," and "C6-C7 annular bulging with left paramedian protruding herniation impinging upon the thecal sac and abutting the anterior cord."  [R. 534-39].

28.  On May 25, 2011, Plaintiff reported to Dr. Maslin that she had numbness and tingling in both hands and her left leg. Dr. Maslin noted a decrease range of motion.  Plaintiff's MRIs showed left paracentral annular tear at L3-L4 and C6-C7 annular bulge with a left sided paramedian herniation impinging on thecal sac and anterior surface of cord.  Dr. Maslin limited Plaintiff to no reaching above shoulder and no lifting over ten pounds.  [R. 367-68, 575].  On June 3, 2011, Dr. Scott Jarmain examined Plaintiff and also reviewed Plaintiff's MRIs.  He made

the same findings regarding the MRI results and noted that Plaintiff suffered from cervical and lumbar radiculopathy. Dr. Jarmain cleared Plaintiff for sedentary desk work, but cautioned that she should not lift objects more than five pounds or reach over her shoulders.  [R. 531-33].

29.  On June 16, 2011, Dr. Jarmain performed left C5-6 and C6-7 transforaminal epidural steroid injections on Plaintiff. Plaintiff's diagnoses were cervical radiculopathy, neck pain, HNP cervical, cervical spondylosis without myelopathy, and cervicalgia.  [R. 456, 466].

30.  On July 19, 2011, Dr. Jarmain performed additional left C5-6 and C6-7 transforaminal epidural steroid injections on Plaintiff.  Plaintiff's diagnoses were cervical HNP, neck pain, degenerative disc disease, stenosis, cervical spondylosis without myelopathy, cervicalgia, and cervical radiculopathy. [R. 434, 442, 444].  The records indicate positive Spurling's test results.  [R. 438].

31.  On August 2, 2011, Dr. Jarmain once again performed right C5-6 and left C6-7 transforaminal epidural steroid injections.  Plaintiff's diagnoses were cervical HNP, neck pain, radiculopathy, and stenosis.  [R. 412, 415, 420, 422].

32.  On August 5, 2011, Plaintiff was examined by both Dr. Lawrence Deutsch and Dr. Jarmain.  She reported numbness in both her hands and the left side of her face.  Dr. Deutsch noted

"positive axial compression pain" and "mildly positive Spurling's sign."  He found that Plaintiff suffered neck pain and cervical radiculopathy and recommended a total disc replacement at C5-6 and an anterior cervical discectomy and fusion at C6-7.  Dr. Jarmain noted that Plaintiff reported no significant improvement in her left neck, shoulder, and upper extremity heaviness, discomfort, numbness, and parasthesias. [R. 510-11, 513-14].

33.  On August 23, 2011, Dr. Deutsch examined Plaintiff, who reported numbness in her face, down the side of her neck, and into her left arm and hand.  She also had nerve numbness in her right arm with heaviness and tingling.  Her May 2011 MRIs evidenced herniated discs and moderate collapse of disc space resulting in central spinal stenosis and bilateral foraminal stenosis, as well as impingement of the thecal sac and deformation of the left side of the cord.  Dr. Deutsch also observed "positive axial compression pain" and "mildly positive Spurling's sign."  [R. 505-06].

34.  On September 28, 2011, Dr. Deutsch performed a total disc replacement at C5-C6 and an anterior cervical dissection and fusion at C6-C7 on Plaintiff.  Plaintiff was diagnosed with cervical HNP, degenerative disc disease, and radiculopathy. [R. 371, 382, 384, 387, 390].  Dr. Deutsch found that Plaintiff had "irritable nerve roots on the left disk herniation C5-C6 and

C6-C7 foraminal narrowing left greater than right C5-6 and C6-
7". [R. 390].

35. Dr. Deutsch examined Plaintiff on October 18, 2011 and
reported that she was "quite happy with the result [of the
surgery] at this point in time." He hoped she would continue to
improve and stated that she could return to work on light duty
with no climbing and no overhead work. [R. 484].

36. On January 3, 2012, Dr. Deutsch cleared Plaintiff for
work post-surgery with no restrictions [R. 553]. Plaintiff saw
Dr. Deutsch again for a post-surgery examination on January 19,
2012. She reported working very long, physically demanding
hours at work, which caused her pain and muscle spasms.
Dr. Deutsch noted that, "at this time, we believe that the
complaints in the left forearm, hand, right scapula, and right
lower back are most likely the result of fatigue." [R. 551].

37. On February 21, 2012, Dr. Deutsch examined Plaintiff,
whose back pain had improved. She continued, however, to
complain of numbness in her right hand and heaviness in her left
arm. Dr. Deutsch noted that she "continues to have difficulty
with her level of activity at work" but that "any restrictions
would put her out of work." [R. 549-50].

38. On March 28, 2012, Dr. Deutsch examined Plaintiff, who
reported feeling great when not working, but "when she is
working, because of the overhead work which involves a lot of

13

heavy lifting above the shoulder level, she gets numbness" in her upper extremities.  Plaintiff also reported burning herself at work without noticing due to numbness.  Dr. Deutsch gave her a "permanent restriction for no overhead work."  [R. 546].

39.  On April 15, 2012, Plaintiff completed a Function Report.  She reported that she is no longer able to walk her dog because she does not have the strength to control him when he pulls.  She also reported that some nights she is unable to sleep due to her discomfort.  [R. 226-27].  Additionally, Plaintiff noted that she sometimes has difficulty chopping food and that she "burn[s] [her]self and [doesn't] know it." [R. 228].  She also noted that "when [her] neck flares up, [her] arm and hand go[] numb, so [she's] unable to do a lot, when [she] reach[es] or lift[s] it causes [her] arm and hand [to] get weak."  [R. 231].

40.  Plaintiff's husband, William Stockett, completed a Third Part Function Report on April 17, 2012.  He reported that Plaintiff can perform "common light duty household chores," but that on some days Plaintiff stays "in bed incapacitated." [R. 234].  Mr. Stockett also noted that Plaintiff has difficulty lifting ten pounds or greater over her head and that numbness and nerve damage cause Plaintiff to drop things.  [R. 239].

41.  On May 19, 2012, Plaintiff was examined by Dr. Ronald Bagner.  Plaintiff reported that the numbness in her right arm

had improved, but that she still had numbness in her left arm and hand that caused difficulty grasping.  On rainy days, both her hands are numb.  Dr. Bagner's impression was that Plaintiff suffered from cervical radiculopathy.  [R. 555-56].

42.  On May 24, 2012, Dr. Richa Mishra examined Plaintiff. Plaintiff reported that she was previously a very active person who worked 50 hours a week, but, due to her pain, she is no longer active or working.  A musculoskeletal examination revealed 12 out of 18 tender points, consistent with fibromyalgia.  Dr. Mishra's impressions were chronic fatigue syndrome, fibromyalgia, neck pain, headache, osteoarthritis, and sleep disorder.  [R. 619-20].

43.  On May 29, 2012, Dr. Ralph Cataldo examined Plaintiff at her attorney's request.  Plaintiff reported headaches, neck and back pain, weakness in her arms and hands when lifting, and numbness in her arms when gripping or squeezing.  Dr. Cataldo observed diminished range of motion in her cervical spine and lower back.  In Dr. Cataldo's opinion, Plaintiff suffers from the following permanent disabilities: "70% permanent partial total based" on her herniated disc at C5-6 and C6-7; "40% permanent partial total" due to her herniated disc at L4-5. [R. 608-10].

44.  On June 7, 2012, state agency examiner Arthur Pirone examined Plaintiff and determined that Plaintiff is limited in

overhead reaching, but unlimited in handling, fingering, and feeling [R. 93].

45.   On June 28, 2012, Dr. Mishra examined Plaintiff, who complained of pain in her feet, knees, and chest, and numbness in her arm.   Dr. Mishra's assessment was fibromyalgia and cervical and lumbar radiculopathy.   Dr. Mishra also noted that Plaintiff "feels Flexeril makes her sleep more, rested when she wakes up in am."   [R. 615].

46.   Dr. Vijay Paharia examined Plaintiff on September 14, 2012.   Plaintiff complained of constant uncomfortable pain and permanent numbness in her left arm and fingers, as well as occasional to frequent pain in her lower back.   She reported difficulty vacuuming, walking her dog, making her bed, and difficulty holding things and typing.   She noted that she drops items.   Dr. Paharia found her hand grip to be strong and noted "no focal neurologic deficits or radiculopathy . . . at this time."   He found no "demonstrable objective evidence of permanent disability" in her thoracic spine.   As for the lumbosacral spine, he found that Plaintiff "represents a partial total disability of three and one-half percent (3½%) referable to the lumbosacral spine."   [R. 633-36, 640-41].   On December 17, 2012, after reviewing additional medical records, Dr. Paharia supplemented his assessment and added that Plaintiff

"represents a partial total disability of [15%] referable to the cervical spine." [R. 642-43].

47. On February 22, 2013, Dr. Edward Tobe neurologically and psychiatrically evaluated Plaintiff. Plaintiff reported suffering from neck and back pain, as well as weakness in her left arm that causes her to drop items. Dr. Tobe noted that "she is aware that she [is] suffering with depression" and that she has difficulty sleeping. He also reported that straight leg testing was positive on the left side, and that she had "left arm drift," as well as weakness in her left arm and hand. Plaintiff grew increasingly sad during the evaluation and "evidenced a loss of sense of wellbeing, a loss of feeling of being able to work productively." Dr. Tobe suggested outpatient psychiatric treatment. In his opinion, "there is a cervical radiculopathy with weakness of the left arm causing a 35 percent permanent of total neurological disability. There is a lumbar radiculopathy with weakness of the left leg causing a 25 percent permanent of total neurological disability. There is a Mood Disorder (NOS) causing a 30 percent permanent of total psychiatric disability." He noted that "whether this woman is totally disabled is an interesting question" and expressed the possibility that she could be retrained, but noted that "the problem would be her dependability, that is, her ability to consistently be able to function in a workplace." [R. 612-13].

48.  On March 4, 2013, Dr. Ross Greenberg evaluated
Plaintiff, who reported a history of chronic depression and
anxiety.  She also expressed current frustration but had not
sought or received formal psychological or psychiatric
treatment.  [R. 645-46].  Dr. Greenberg noted that Plaintiff
displayed anxiety, depression, and tearfulness.  He found some
disorganization of thinking, anxiety, depression, and an
adjustment disorder with mixed anxiety and depressed mood
related to her childhood and death of relatives.  [R. 648].

49.  On May 10, 2013, Dr. Zenon Switenko examined
Plaintiff, who presented with "depressed mood, difficulty
concentrating, diminished interest or pleasure and fatigue, but
denie[d] decreased need for sleep, difficulty falling asleep,
difficulty staying asleep, excessive worry or thoughts of death
or suicide."  [R. 661].

50.  On November 17, 2013, Plaintiff presented at the
emergency department at Virtua Hospital due to back pain.  She
was diagnosed with thoracic back pain and discharged with a
prescription for Toradol.  [R. 653-56].

**THE APRIL 15, 2014 ADMINISTRATIVE HEARING**

51.  At the hearing before the ALJ on April 15, 2014,
Plaintiff testified that she previously worked for Kraft as a
food products sales representative, but that she ultimately left
her job because "they couldn't accommodate [her] restrictions"

and she "wasn't physically able to lift over [her] head"
[R. 53].  She explained that while she can do some light
household chores, she has hired a cleaner to do the "heavy
cleaning" [R. 55].  Plaintiff testified that due to her pain and
difficulty sleeping, she has stopped going to church and does
not make plans with friends in advance [R. 56-57].  She also
noted that she suffers from frequent headaches and migraines,
but that she avoids taking strong medications because she has
had cancer and has spots on her liver.  Plaintiff testified that
her headaches occur three to four times a week and last between
two and eight hours, while her migraines occur a couple times
per month, last one to three days, and cause vomiting.  [R. 57-
58].  Additionally, Plaintiff testified that she has numbness in
her hands, which has caused her to drop items and even to burn
herself without noticing, and that she suffers from neck pain
that radiates into her left arm [R. 59-60, 68].  She testified
that the numbness in her left arm and hand is constant [R. 68].
Plaintiff stated that she cannot carry any weight with her left
arm, but that she believes she can carry up to an eight-pound
gallon of milk with her right arm [R. 62-63].  Plaintiff also
testified that she suffers from chronic fatigue, has to nap
daily, and feels like she has "a fog head" [R. 71].

   52.  Mr. Young, the vocational expert, also testified at
the ALJ hearing [R. 76-81].  The ALJ presented several

19

hypothetical situations to Mr. Young.  First, Mr. Young assessed
a hypothetical person with Plaintiff's age, education, training,
and background who was limited to "minimal overhead reaching."
Mr. Young opined that this person could perform Plaintiff's past
relevant work as generally performed [R. 76].  Next, Mr. Young
evaluated this hypothetical person, but with further limitations
to only sedentary work and no overhead reaching.  Mr. Young
testified that "past work could not be done, obviously" but that
this person could perform other jobs, such as office clerical
positions and inspectors or sorters [R. 76].  As Plaintiff was
fifty years old at the time of the hearing, the ALJ and the
vocational expert discussed transferability of skills [R. 76-
78].  Given the transferability of Plaintiff's skills, Mr. Young
testified that she could perform the job of a telemarketer,
which is semi-skilled, sedentary work, which involves no
overhead lifting [R. 78].  Finally, the ALJ requested that Mr.
Young consider the same hypothetical person, but who could only
stand for up to half an hour to an hour, sit for an hour, lift
up to ten pounds with the right hand, and only perform minimal
gripping with the left hand.  Mr. Young testified that there
were no jobs in the national economy that such a person could
perform [R. 78].

   53.  Plaintiff's attorney posed an additional hypothetical
to Mr. Young, in which Mr. Young considered a hypothetical

person with the same age, education, and background as
Plaintiff, but who was limited to sedentary work, minimal
overhead reaching, and only occasional handling, fingering,
feeling, and reaching.  Plaintiff's attorney asked whether such
these limitations would preclude the jobs he mentioned and Mr.
Young testified that "[t]hat precludes all of it."  [R. 78-79].

**LEGAL STANDARD**

54.  The Commissioner has promulgated a five-step
sequential analysis for evaluating a claimant's disability, as
outlined in 20 C.F.R. § 404.1520(a)(4)(i)-(v).  In this matter,
the ALJ determined that Plaintiff was able to perform her past
relevant work as a food products sales representative as
generally performed and, accordingly, concluded that Plaintiff
was not disabled at Step Four of the analysis.  The ALJ
nonetheless proceeded to Step Five and held, in the alternative,
that Plaintiff was not disabled because she could perform other
work in the national economy.

55.  A reviewing court must uphold the Commissioner of
Social Security's factual findings if they are supported by
"substantial evidence," even if the court "would have decided
the inquiry differently."  Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir.
2000); see also 42 U.S.C. §§ 405(g), 1383(c)(3).  "Substantial
evidence" means "'more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Cons. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Where the evidence is susceptible to "more than one rational interpretation, the Commissioner's conclusion must be upheld." Ahearn v. Comm'r, 165 F. App'x 212, 215 (3d Cir. 2006) (citing Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986); Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984)).

56. If faced with conflicting evidence, however, the Commissioner "must adequately explain in the record his reason for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F. 2d 581 (3d Cir. 1986)). Stated differently, "unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)) (internal quotations omitted); see also Guerrero v. Comm'r, 2006 WL 1722356, at *3 (D.N.J. June 19, 2006) ("The ALJ's

responsibility is to analyze all the evidence and to provide adequate explanations when disregarding portions of it."), aff'd, 249 F. App'x 289 (3d Cir. 2007).

57.   While the Commissioner's decision need not discuss "every tidbit of evidence included in the record," Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004), it must consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections," Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000); see also Fargnoli, 247 F.3d at 42 ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law.").

58.   In addition to the "substantial evidence" inquiry, the reviewing court must also determine whether the ALJ applied the correct legal standards.  See Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983).  The Court's review of legal issues is plenary. Sykes, 228 F.3d at 262 (citing Schaudeck v. Comm'r, 181 F.3d 429, 431 (3d Cir. 1999)).

**LEGAL ANALYSIS**

59.  The ALJ thoroughly recounted Plaintiff's extensive medical history in his decision.  See, e.g., [R. 20-28].  The Court agrees with the Plaintiff, however, that the ALJ's analysis was deficient in certain respects, which will be discussed in detail herein.  The Court will address each of Plaintiff's arguments on appeal in turn.

**Step 3: Listing Level 1.04A**

60.  Plaintiff first argues that the ALJ erred at Step Three of the sequential analysis in finding that Plaintiff does not suffer from a listing level impairment consistent with Listing 1.04A, disorders of the spine.  Plaintiff's Brief ("Pl. Br.") at 7-10 [Docket No. 8].

61.  At Step Three of the sequential analysis, the ALJ must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  "For a claimant to show [her] impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2004) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)) (emphasis in original).  If a claimant's impairments meet or medically equal one of the listed

impairments, the ALJ must find the claimant to be disabled.  On the other hand, if the claimant's impairments do not meet or medically equal a listing level impairment, the analysis proceeds to the RFC determination and then Step Four.

62.  Listing 1.04A provides as follows: "Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."

63.  During the hearing, Plaintiff's counsel requested that the ALJ consider Listing 1.04 [R. 46].  In determining that Plaintiff's impairments did not meet or medically equal those in Listing 1.04, the ALJ reasoned: "Although the claimant has impairments which are considered to be 'severe,' they are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. Part 404.  In this regard, we note that

no treating or examining physician has mentioned findings
equivalent in severity to the criteria of any listed impairment.
In reaching this conclusion, the undersigned has also considered
the opinion of the State Agency medical consultants who
evaluated the initial and reconsideration levels of the
administrative review process and reached the same conclusion
that the claimant's impairments do not meet or equal a Listing
(20 CFR 404.1527(f), 416.927(f) and Social Security Ruling 96-
6p).  We have specifically reviewed Listings 1.04." [R. 29].

64.  The ALJ continued: "The claimant's impairment of
degenerative disc disease does not meet Listing 1.04 because she
does not have one of the listed disorders (herniated nucleus
pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis,
degenerative disc disease, facet arthritis, or vertebral
fracture resulting in a compromise of the nerve root or spinal
cord) *in conjunction with* evidence of nerve root compression
characterized by neuro-anatomic distribution of pain, limitation
of motion of the spine, motor loss (atrophy with associated
muscle weakness or muscle weakness) accompanied by sensory or
reflex loss, and, in connection with the lumbar spine
impairment, also a positive straight leg raising test (sitting
and supine)." [R. 29] (emphasis in original).

65.  Plaintiff contends that the medical record supports a
listing level impairment consistent with Listing 1.04A and

refers the Court to several medical records that document Plaintiff's disc herniations, collapse of the disc space, impingement of the thecal sac and deformation of the spinal cord.  Pl. Br. at 9 (citing [R. 272, 276, 288, 316, 324, 371, 387, 390, 420, 444, 460, 486, 501, 506, 514, 536, 545, 548, 566]).  Plaintiff also relies upon the medical records documenting Plaintiff's diagnosis of cervical radiculopathy, which results in tingling, numbness, weakness, pain, and parasthesias in Plaintiff's upper extremities.  Id. (citing [R. 271, 282, 323-24, 330, 332, 338, 358, 365, 479, 505, 514, 519, 546, 555]).  Specifically, Plaintiff argues that both Dr. Atlas's findings and her May 23, 2011 MRIs evidence cord impingement resulting in compromise of the nerve root and that this is confirmed by Plaintiff's "repeat diagnoses of radiculopathy."  Plaintiff's Reply Brief ("Pl. Reply Br.") at 1 [Docket No. 10].  Plaintiff avers that "radiculopathy is, by definition, the compromise of a nerve root."  Id.

66.  The Commissioner, in turn, contends that the medical records include no findings that "encompassed nerve root compromise and compression such as would satisfy Listing 1.04A." Commissioner's Opposition Brief ("Comm. Opp. Br.") at 15 [Docket No. 9].  The Commissioner further argues that "impinging and/or abutting the thecal sac simply are not the same as showing a nerve root compromise," and cites a number of cases

27

from district courts outside the District of New Jersey to support this point.  Id. at 15-16.

67.  The Third Circuit "requires the ALJ to set forth the reasons for his decision," including his determination that a plaintiff's impairments do not meet a listed impairment. Burnett, 220 F.3d at 119.  In Burnett, the ALJ found at Step Three that, while the claimant "suffer[ed] from a severe musculoskeletal impairment, said impairment failed to equal the level of severity of any disabling condition contained in Appendix 1."  Id.  The Third Circuit explained that it "ha[d] no way to review the ALJ's hopelessly inadequate step three ruling" and remanded the case for the ALJ to more fully discuss the evidence and explain his reasoning supporting a determination that the claimant's severe impairment did not meet or medically equal a listed impairment.  Id. at 120.

68.  From the ALJ's limited discussion of Listing 1.04A, the Court finds his Step Three finding to be conclusory.  The ALJ does not identify which of the medical criteria in Listing 1.04A are not met or medically equaled.  Therefore, it is unclear to the Court on what basis the ALJ found that Plaintiff's impairment of degenerative disc disease does not meet or medically equal Listing 1.04A.

69.  It is clear that the ALJ found that Plaintiff suffers from degenerative disc disease [R. 20, 29].  Likewise, the

medical record evidences that Plaintiff suffers from herniated
nucleus pulposus (HNP) and spinal stenosis.  See, e.g., [R. 287-
88, 371, 382, 384, 387, 390412, 415, 420, 422, 434, 442, 444,
456, 466, 505-06, 544].  The medical criteria "disorders of the
spine" is clearly supported by the medical record.  Based upon
the parties' arguments, the dispute turns instead on whether the
medical record supports a finding of compromise of a nerve root
or the spinal cord as well as nerve root compression.

    70.  Plaintiff has identified numerous instances in the
medical record that support a finding of nerve root or spinal
cord compromise and nerve root compression.  These include
Dr. Atlas's finding of cord compression [R. 287, 566] and
Plaintiff's May 2011 MRIs, which revealed "herniation impinging
upon the cervical cord" and "impinging upon the thecal sac and
abutting the anterior cord."  [R. 534-39].  Likewise,
Plaintiff's December 1, 2010 MRI revealed disc bulge encroaching
upon the anterior thecal sac, and "likely encroachment upon the
right C7 nerve."  [R. 540-41].  Dr. Deutsch also found that
Plaintiff had "irritable nerve roots."  [R. 390].

    71.  As for nerve root compression, the Plaintiff notes
that she has been repeatedly diagnosed with radiculopathy, which
is evidence of nerve root compression.  See, e.g., Killen v.
Stryker Spine, 2012 WL 4482371, at *1 n. 4 (W.D. Pa. Aug. 21,
2012) ("Radiculopathy is the medical term for the pain and other

29

symptoms resulting from a compressed nerve root."); Caraballo v. Astrue, 2012 WL 983579, at *8 n. 27 (M.D. Pa. Mar. 22, 2012) ("Radiculopathy is a condition due to a compressed nerve in the spine that can cause pain[,] numbness, tingling, or weakness along the course of the nerve.") (quoting Radiculopathy, MedicineNet.com, www.medicinenet.com/radiculopathy/article.htm); Wojciechowski v. Barnhart, 2004 WL 878468, at *2 n. 2 (D. Del. Apr. 21, 2004) ("Radiculopathy is a disease of the spine in which there is a compression on the nerve roots . . . .") (citing Dorland's Illustrated Medical Dictionary 1511 (29th ed. 2000)).  Additionally, the medical record establishes that Plaintiff had positive Spurling's tests, see, e.g., [R. 438, 505-06, 510-11], which indicate nerve root compression.  See, e.g., Daniels v. Astrue, 2008 WL 4148872, at *5 n. 1 (E.D. Ky. Sept. 3, 2008) ("A positive Spurling's test indicates nerve root compression.") (citing Taber's Cyclopedic Medical Dictionary (20th ed. 2005)); Norman v. Astrue, 912 F. Supp. 2d 33, 49 n. 10 (S.D.N.Y. 2012) (same).

72.  Whether or not impinging upon the thecal sac is evidence of nerve root compromise or compression, medical records exist that may, if credited by the ALJ, support a finding of nerve root or spinal cord compromise and nerve root compression and, therefore, a listing level impairment.  The Court makes no findings as to whether the medical record does or

does not establish a listing level impairment.  Rather, the
Court emphasizes simply that the ALJ is required to "set forth
the reasons for his decision" at Step Three, <u>Burnett</u>, 220 F.3d
at 119, and "consider all the evidence and give some reason for
discounting that which she rejects."  <u>Masher v. Astrue</u>,
354 F. App'x 623, 627 (3d Cir. 2009).  As it currently stands,
however, the Court is unable to determine whether or how the ALJ
considered this evidence given the ALJ's limited Step Three
discussion and, therefore, whether that determination is
supported by substantial evidence.  Remand is necessary for the
ALJ to "fully develop the record and explain his findings at
step three, including an analysis of whether and why"
Plaintiff's impairments "are or are not equivalent in severity
to" Listing 1.04A.  <u>See Burnett</u>, 220 F.3d at 120.

### **Residual Functional Capacity**

73.  Plaintiff next takes issue with the ALJ's RFC
determination, arguing that the ALJ did not take into account
all of her impairments and the limitations stemming from those
impairments.  Pl. Br. at 10-15.  Plaintiff also contends that
the ALJ's RFC determination is improperly vague as it does not
specifically address the nature and extent of Plaintiff's
overhead reaching limitations.  <u>Id.</u> at 16-17.  Finally,
Plaintiff asserts that the ALJ ignored the impact of Plaintiff's
fibromyalgia, chronic fatigue syndrome, osteoarthritis, migraine

headaches, and sleep disorder in making his RFC determination. Id. at 18.

74.   A plaintiff's RFC is her maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  Social Security Ruling ("SSR") 96-8p.  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or another similar schedule.  The RFC assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545, 416.945; Hartranft v. Apfel, 181 F.3d 358, 359 n. 1 (3d Cir. 1999) ("'[RFC]' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").  Ultimately, the final responsibility for determining a claimant's RFC is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).

75.   SSR 96-8p dictates that the RFC assessment is a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  SSR 96-8p.  In order to meet the requirements of SSR 96-8p, the ALJ "must specify the evidence that he relied upon to support his conclusion."  Sullivan v. Comm'r of Soc. Sec., 2013 WL 5973799, at *8 (D.N.J. Nov. 8, 2013) (internal citations and quotations omitted).  "Moreover, the ALJ's finding of residual functional capacity must 'be accompanied by a clear

and satisfactory explanation of the basis on which it rests.'"
Fargnoli, 247 F.3d at 41 (quoting Cotter v. Harris, 642 F.2d
700, 704 (3d Cir. 2001)).

76.  As the Court already noted, the ALJ found that
Plaintiff "has the residual functional capacity to perform light
work . . . except that she is limited with overhead reaching."
[R. 29].

### Handling, Fingering, Feeling Limitations

77.  With regards to the ALJ's RFC assessment, Plaintiff
first argues that "the ALJ ignored the Plaintiff's diagnoses of
cervical and lumbar radiculopathy affecting the upper and lower
extremities," even though "[t]he record throughout establishes
limitations stemming from the cervical radiculopathy that impair
the Plaintiff's ability to handle, finger, and feel."  Pl. Br.
at 14.  Furthermore, Plaintiff's lumbar radiculopathy results in
heaviness and pain in her left leg that "prevents her from doing
things like kneeling, vacuuming, and unloading the dishwasher."
Id. at 14-15.  Yet, in spite of this evidence, the ALJ's RFC
determination "indicates no limitations involving Plaintiff's
ability to perform those functions."  Id. at 15.  Plaintiff
contends that "[w]ithout some indication as to how these
impairments [cervical and lumbar radiculopathy] were considered,
there is no way for subsequent reviewers to know if the ALJ's

conclusion is supported by substantial evidence." Pl. Reply Br. at 3.

78.   The Commissioner counters that the ALJ evaluated all the medical evidence, including Plaintiff's diagnoses of cervical and lumbar radiculopathy, and, therefore, the ALJ's decision not to assign handling, fingering, and feeling limitations is supported by substantial evidence. Comm. Opp. Br. at 17-18. Additionally, the Commissioner explains that, although SSR 96-8p requires a function-by-function analysis, "there is no format to which an ALJ must adhere when giving her reasoning so long as there is sufficient development of the record and explanation of findings to permit meaningful review." Id. at 18 n. 1 (quoting Tompkins v. Astrue, 2013 WL 1966059, at *13 (D.N.J. May 10, 2013) (quoting Jones, 364 F.3d at 505)).

79.   Throughout his decision, the ALJ noted that Plaintiff has a documented history of radiculopathy, numbness in her arms and hands, and paresthesia. He also noted that certain medical records indicated strong hand grip. Nowhere in the decision, however, did the ALJ set forth his reasoning or explanation for not assigning any handling, fingering, or feeling limitations in the RFC determination.

80.   There is evidence in the medical record, which, if credited by the ALJ, would support handling, fingering, and/or feeling restrictions of some kind. This evidence includes, but

34

is not limited to, Plaintiff's many diagnoses of cervical and lumbar radiculopathy, see, e.g., [R. 371, 382, 434, 456, 510-11, 555-56, 612-13, 615, 633-36], the numbness and weakness in her hands and fingers, see, e.g., [R. 59-60, 68, 231, 239, 318, 546, 549-50, 555-56, 608-10, 615, 633-36], her reported difficulty typing and doing other tasks that require fine motor skills, see, e.g., [R. 633-36] and Plaintiff's reports of dropping items due to numbness and/or pain, see, e.g., [R. 59-60, 239, 349-50, 612-13, 633-36].  While the ALJ discussed certain of these records separately throughout his decision, he did not explain how he weighed the evidence and ultimately determined that no handling, fingering, or feeling limitations were warranted.

81.  The Court reiterates that SSR 96-8p requires that an ALJ make a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities" in crafting the RFC determination.  While it is true that "there is no format to which an ALJ must adhere when giving [his] reasoning," there still must be "'sufficient development of the record and explanation of findings to permit meaningful review.'"  Tompkins, 2013 WL 1966059, at *13 (quoting Jones, 364 F.3d at 505).

82.  In its brief, the Commissioner pieces together the ALJ's description of certain medical records to formulate an explanation to support the ALJ's decision not to assign any

35

handling, fingering, or feeling limitations.  See Comm. Opp. Br. at 17-18.  This, however, is a post hoc justification for the ALJ's decision, which is insufficient.  See Fargnoli, 247 F.3d at 44 n. 7 (noting that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).  The Court repeats that an ALJ's RFC determination "must 'be accompanied by a clear and satisfactory explanation of the basis on which it rests.'" Fargnoli, 247 F.3d at 41 (quoting Cotter, 642 F.2d at 704). Here, the ALJ's RFC determination was accompanied by no explanation of why no handling, fingering, and feeling limitations were appropriate, even though the record contained evidence that could support such limitations, if credited by the ALJ.  Having reviewed the record, which documents radiculopathy, hand and finger numbness and pain, and problems with fine motor skills, such as dropping items and difficulty typing, and in light of the lack of explanation on the part of the ALJ, the Court finds that the ALJ's determination not to assign any handling, fingering, or feeling limitations of any kind is not supported by substantial evidence.  The Court notes that this is harmful error.  Had the ALJ assigned such limitations, Plaintiff would have been precluded from the occupations considered by the ALJ at Steps Four and Five, which, as the Plaintiff points out,

require frequent handling and/or fingering.  See Pl. Br. at 15.
On remand, the ALJ should consider and weigh all the relevant
evidence and set forth his reasoning for whether or not such
limitations are appropriate.

### Overhead Reaching Limitation

83.  Next, Plaintiff contends that, in the RFC assessment,
"[t]he ALJ failed to explain how the Plaintiff's ability to
reach overhead is limited and, specifically, to what extent she
is limited in that regard."  Pl. Br. at 16.  According to
Plaintiff, "[w]ithout an exact understanding of the extent of
the Plaintiff's limitations . . . a proper determination cannot
be made as to whether those limitations would preclude an
ability to perform that past and other work."  Pl. Reply Br. at
3.  Likewise, in Plaintiff's view, the ALJ's reliance on the
vocational expert's testimony that Plaintiff could perform her
past relevant work if she were limited to "minimal overhead
reaching" is equally vague, as it "still leaves unclear to
subsequent reviewers what constitutes 'minimal' overhead
reaching."  Pl. Br. at 16.  Finally, Plaintiff claims that the
Dictionary of Occupational Titles ("DOT") states that her past
relevant work as a food products sales representative requires
frequent reaching and, therefore, that there is a conflict
between the vocational expert's testimony and the DOT
description.  Id. at 16–17.  The Plaintiff acknowledges,

however, that the DOT does not distinguish between "reaching outward in front and reaching overhead." Id. at 17.  Pursuant to SSR 00-4p, the ALJ must identify any conflict between the DOT and the vocational expert testimony and resolve the conflict, which, in Plaintiff's view, the ALJ failed to do.

84.  The Commissioner, in turn, contends that any error by the ALJ in not further explaining the nature and extent of Plaintiff's overhead reaching limitations is harmless error because the ALJ relied upon the vocational expert's testimony that an individual limited to even "minimal overhead reaching" could still perform Plaintiff's past relevant work.  Comm. Opp. Br. at 19.  Moreover, the Commissioner argues that since it is undisputed that the DOT is silent as to overhead reaching, there was no conflict between the DOT and the vocational expert's testimony that the ALJ was required to resolve.  Accordingly, in the Commissioner's view, the ALJ was permitted to rely on the vocational expert's testimony regarding the ability of an individual limited to minimal overhead reaching to work as a food products sales representative.  Id. at 19-21.

85.  The ALJ did not articulate why he found that Plaintiff was "limited with overhead reaching" or what the nature and extent of that limitation was.  In evaluating the opinions of Dr. Jarmain and Dr. Deutsch, who both opined that Plaintiff could perform no overhead reaching whatsoever, the ALJ found as

38

follows: "The undersigned notes that in May 2011, Dr. Jarmain limited the claimant to sedentary desk work and she was not to lift objects weighing more than five pounds or reach above shoulder level . . . ; however, this restriction was only temporary; because in October 2011, Dr. Deutsch advised the claimant he would send her back to work on light duty but with no climbing and no overhead work; no lifting greater than 20 pounds; and no pushing or pulling greater than 20 pounds . . . ; and by March 2012, the claimant reported to Dr. Deutsch that she felt great and she was not really having pain; and she had even played golf.  She reported she was working but because of the overhead work, which involves a lot of heavy lifting above the shoulder level, she was getting numbness in her upper extremities.  At that time, Dr. Deutsch indicated that the claimant could return to work with the only restriction being no overhead work and he placed her on maximum medical improvement . . . ."  [R. 33].

86.  The ALJ then addressed the vocational expert testimony: "In response to a hypothetical question which assumed the existence of an individual of the claimant's age, education and past relevant work, who was capable of performing the exertional demands of light work, except she is limited to <u>minimal</u> overhead reaching, the Vocational Expert responded that such an individual could return to the claimant's past relevant

work as a food product salesperson as it is generally
performed." [R. 34] (emphasis added).

87.  Additionally, at Step Five, the ALJ explained: "the
vocational expert was asked if any occupations exist which could
be performed by an individual with the same age, education, past
relevant work experience, and residual functional capacity of
sedentary with minimal overhead reaching, and with skills
acquired in the claimant's past relevant work but no additional
skills.  The vocational expert responded and testified that
representative occupations such an individual could perform
include: a telephone solicitor/telemarketer, . . . which has an
SVP of 3 (semi-skilled) and no overhead reaching. . . . He
further stated that the individual could also perform work as a
clerical order clerk . . . [or] as an inspector/sort[er]."  The
ALJ further stated that "[p]ursuant to SSR 00-4p, the
undersigned has determined that the vocational expert's
testimony is consistent with the information contained in the
Dictionary of Occupational Titles."  [R. 35].

88.  As a preliminary matter, the Court agrees with the
Commissioner that "because the DOT is silent with regard to
overhead reaching, the [vocational expert's] testimony
concerning a person with a limitation to overhead reaching does
not create a conflict with the DOT." Comm. Opp. Br. at 20.  The
Court sees no harmful error in the ALJ's decision to rely upon

40

the vocational expert's testimony without identifying and resolving a conflict between that testimony and the DOT, as no such conflict exists.  In any case, the Third "Circuit has emphasized that the presence of inconsistencies does not <u>mandate</u> remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'"  <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 617 (3d Cir. 2014) (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 557 (3d Cir. 2005)) (emphasis in original).  Accordingly, the Court turns to whether the ALJ's determination as to Plaintiff's ability to reach overhead is supported by substantial evidence.

89.  The Court is unable to assess whether the overhead reaching limitation in the RFC determination is supported by substantial evidence because the ALJ did not set forth the nature and extent of the limitation, his reasons for assigning such a limitation, or the evidence supporting the limitation. The Court agrees with Plaintiff that the ALJ's reliance at Steps Four and Five on the vocational expert's testimony regarding an individual limited to <u>minimal</u> overhead reaching is vague and unsatisfactory.  Pl. Reply Br. at 3-4.  Additionally, it is unclear to the Court whether the ALJ intended to incorporate the <u>minimal</u> overhead reaching limitation into the RFC.

90.  Furthermore, the ALJ was required to "specify the evidence that he relied upon to support his conclusion,"

41

Sullivan, 2013 WL 5973799, at *8, and provide "a clear and satisfactory explanation of the basis on which [the RFC determination] rests." Fargnoli, 247 F.3d at 41.  The ALJ, however, did not adequately explain the limitation assigned, or the evidence and reasoning supporting it, in the RFC assessment. Accordingly, the Court finds that the ALJ's RFC determination is incomplete and not supported by substantial evidence.

91. The Court notes that, if this were the only error in the ALJ's RFC determination, it would be harmless error.  At Step Five, the ALJ found that Plaintiff could perform certain jobs that exist in the national economy.  In so finding, the ALJ relied upon the vocational expert's testimony that a hypothetical individual with Plaintiff's profile could perform the work of a telephone solicitor/telemarketer, which involves no overhead reaching whatsoever.  [R. 35].  Therefore, assuming no other changes to the RFC, even if Plaintiff was limited to no overhead reaching, the ALJ would have found her not disabled at Step Five.

92. However, as the Court will remand the matter for further proceedings, including further evaluation of the RFC determination regarding certain manipulative limitations as discussed above, the Court finds that remand is also appropriate on this issue.  For example, at the administrative hearing, the vocational expert testified that a hypothetical individual who

42

is limited to sedentary work, minimal overhead reaching, and
only occasional handling, fingering, and feeling would be
precluded from all work discussed at the hearing.  [R. 78-79].
On remand, the ALJ should consider whether any handling,
fingering, and/or feeling limitations are warranted and, if so,
whether the combination of such handling, fingering, and/or
feeling limitations and any overhead reaching limitations would
result in a finding of disability.

### Fibromyalgia, Chronic Fatigue, Osteoarthritis, Migraine Headaches, and Sleep Disorder

93.  Finally, with regards to the ALJ's RFC determination,
Plaintiff argues that the RFC is "incomplete" because "the ALJ
improperly ignored the impact of the Plaintiff's fibromyalgia,
chronic fatigue syndrome, and osteoarthritis," as well as the
impact of her migraine headaches and sleep disorder.  Pl. Br.
at 18.

94.  The Commissioner responds to this by arguing that the
ALJ did consider Plaintiff's diagnosis of fibromyalgia, but
found that it was unsupported by the remainder of the medical
record.  Additionally, according to the Commissioner, no medical
records support Plaintiff's contention that her fibromyalgia
resulted in functional limitations that should have been
incorporated into her RFC.  Comm. Opp. Br. at 21.  In any case,
Plaintiff's reports of her activities of daily living support a

finding that no such limitations existed.  Id. at 21-22.
Likewise, the ALJ considered Plaintiff's complaints of fatigue
and sleep difficulties, but when contrasted with her activities
of daily living, determined that no limitations resulted from
that fatigue.  Id. at 22.  As to Plaintiff's headaches and
osteoarthritis, the Commissioner argues that the ALJ discussed
these alleged impairments and properly assigned no additional
limitations, as no medical records document functional
limitations resulting from these impairments.  Id. at 22-23.
Plaintiff contends that these arguments are nothing more than
post hoc rationalizations for the ALJ's decision, which are not
permitted.  Pl. Reply Br. at 4.

95.  The ALJ addressed Plaintiff's diagnosis of
fibromyalgia as follows: "In May 2012, Dr. Mishra diagnosed the
claimant with having fibromyalgia as she had 12 out of 18 tender
points consistent with fibromyalgia . . . .  The undersigned
notes that this was just a one-time examination and since then
no other treating or examination physician has noted the
claimant having symptoms consistent with fibromyalgia . . . ;
therefore, the undersigned gives only some weight to
Dr. Mishra's diagnosis . . . ."  [R. 33].

96.  The ALJ explained that he assigned only some weight to
Dr. Mishra's diagnosis of fibromyalgia because it was the
product of one examination, rather than a long-term treatment

44

relationship, and because it was not corroborated by any other medical evidence in the record.  The Court sees no error in this determination.  Moreover, Dr. Mishra did not opine that Plaintiff's fibromyalgia caused any functional or work-limited limitations.  Accordingly, the Court finds that the ALJ's decision not to include any limitations caused fibromyalgia in Plaintiff's RFC is supported by substantial evidence.

97.  As to Plaintiff's claims of chronic fatigue and sleep disorder, the ALJ noted that, although "[t]he claimant testified that she has difficulty sleeping, and she takes naps," "[i]n her Function Report the claimant reported that only some nights she is uncomfortable and has difficulty sleeping." [R. 30-31] (emphasis in original).  The ALJ also noted that the Plaintiff reported to Dr. Mishra that she was sleeping better and felt well rested when taking Flexeril.  [R. 25, 31].

98.  Although the ALJ did not specifically address Dr. Mishra's diagnoses of chronic fatigue and sleep disorder, he evaluated the record as it related to Plaintiff's fatigue and sleep difficulties.  He compared Plaintiff's accounts of chronic fatigue and difficulty sleeping with her activities of daily living and her statements to Dr. Mishra and determined that no restrictions caused by fatigue or sleep difficulties were warranted.  This determination is supported by substantial evidence.

99.   The Court next turns to Plaintiff's diagnosis of osteoarthritis.   The ALJ merely notes that Dr. Mishra diagnosed Plaintiff with osteoarthritis [R. 25], but does not evaluate the diagnosis or any limitations stemming from it, or explain the weight given to the diagnosis, if any.   The Court reiterates that, while the ALJ is not required to discuss "every tidbit of evidence included in the record," Hur, 94 F. App'x at 133, he must consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections."   Burnett, 220 F.3d at 122.   Here, the ALJ appears to have largely ignored Dr. Mishra's diagnosis of osteoarthritis.   The Court, however, finds this error to be harmless, as there is no evidence that Plaintiff's osteoarthritis, if credited by the ALJ, would have impacted the RFC determination, given that Dr. Mishra assigned no limitations to Plaintiff stemming from the diagnosis. See [R. 619-20].

100. Finally, with regard to Plaintiff's headaches, the ALJ reasoned as follows: "The claimant testified having headaches three to four times a week, but she has not sought any treatment for her headaches and despite the complaints of allegedly having disabling symptoms, the claimant has taken only over-the-counter medications for those symptoms." [R. 31].   Accordingly, having found Plaintiff's reports of disabling pain and symptoms due to

her headaches not entirely credible, the ALJ assigned no limitations stemming from the headaches.

101. "The credibility determinations of an administrative judge are virtually unreviewable on appeal." Hoyman v. Colvin, 606 F. App'x 678, 681 (3d Cir. 2015) (quoting Bieber v. Dep't of the Army, 287 F.3d 1358, 1364 (Fed. Cir. 2002)).  Therefore, an ALJ's credibility determination is accorded great deference and will not be disturbed unless it is "inherently incredible or patently unreasonable."  See Blue Ridge Erectors v. Occupational Safety & Health Review Comm'n, 261 F. App'x 408, 410 (3d Cir. 2008); St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005).  Here, the ALJ evaluated the evidence of headaches and found that the alleged severity of Plaintiff's symptoms, such as disabling pain spanning several days and vomiting, was inconsistent with Plaintiff's failure to seek medical treatment for her headaches or to take prescription medications.  The Court finds this reasoning sufficient and deserving of deference.  Accordingly, the Court will not disturb the ALJ's decision not to assign any limitations stemming from Plaintiff's headaches in the RFC determination.

**Weighing the Medical Evidence**

102. Finally, Plaintiff contends that the ALJ improperly weighed the medical opinions of Dr. Jarmain, Dr. Cataldo, Dr. Tobe, and Dr. Mishra.

**Dr. Jarmain's Opinions**

103. First, in Plaintiff's view, the ALJ improperly rejected the opinions of Plaintiff's treating physician, Dr. Jarmain, regarding Plaintiff's ability to lift no more than five pounds and her inability to perform any overhead reaching. Plaintiff argues that Dr. Jarmain's opinions are well-supported by the medical record as a whole and should have been given great, if not controlling, weight.  Pl. Br. at 20-21.

104. The Commissioner responds to these concerns by arguing that "[t]he ALJ discussed the restrictions but characterized them as temporary, and the record clearly supports the ALJ's conclusion."  Comm. Opp. Br. at 25-26.  Instead, according to the Commissioner, "it was Dr. Deutsch [rather than Dr. Jarmain] who opined as to a set of functional restrictions . . . that were intended to be permanent."  Id. at 26.

105. In addressing Dr. Jarmain opinions, the ALJ found as follows: "The undersigned notes that in May 2011, Dr. Jamian [sic] limited the claimant to sedentary desk work and she was not to lift objects weighing more than five pounds or reach above shoulder level . . . ; however, this restriction was only temporary; because in October 2011, Dr. Deutsch advised the claimant he would send her back to work on light duty but with no climbing and no overhead work; no lifting greater than 20 pounds; and no pushing or pulling greater than 20 pounds . . . ;

48

and by March 2012, the claimant reported to Dr. Deutsch that she felt great and she was not really having pain; and she had even played golf.  She reported she was working but because of the overhead work, which involves a lot of heavy lifting above the shoulder level, she was getting numbness in her upper extremities.  At that time, Dr. Deutsch indicated that the claimant could return to work with the only restriction being no overhead work and he placed her on maximum medical improvement . . . ."  [R. 33].  The ALJ did not state how much weight he gave to Dr. Jarmain's opinions, although, the Court notes, he apparently rejected the opinions as the RFC only states that Plaintiff is limited in overhead reaching, not that she is unable to perform any overhead reaching.

106. "An ALJ should give treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.  The ALJ is not permitted to make speculative inferences from medical reports, nor can she employ her own expertise against that of a physician who presents competent expert evidence.  Contradictory medical evidence is required for an ALJ to reject a treating physician's opinion outright.  Where the evidence conflicts, the ALJ may choose whom to credit, but [he] cannot reject evidence for no reason or for the wrong reason.  To the contrary, [he] must

consider all the evidence and give some reason for discounting that which [he] rejects." Masher, 354 F. App'x at 627 (internal citations, quotations, alterations omitted).

107. Additionally, pursuant to SSR 96-2p, if the ALJ finds that the treating source's opinion is not well-supported, that "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all the factors provided in 20 CFR 404.1527 and 416.927." These factors include the examining relationship, the treatment relationship (the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship), supportability, consistency, and specialization. See 20 C.F.R. § 404.1527(c)(1)-(5).

108. The ALJ did not explain the weight he gave to Dr. Jarmain's opinions. Instead, he characterized the opinions as "temporary" and concluded that Dr. Deutsch, Plaintiff's other treating physician, provided the permanent opinions. The ALJ, however, appears to have rejected both Dr. Jarmain and Dr. Deutsch's opinions as to Plaintiff's ability to reach overhead. Regardless of whether Dr. Jarmain's opinion that Plaintiff could engage in no overhead reaching whatsoever was temporary or not, that restriction was continued by Dr. Deutsch.

109. It is axiomatic that an ALJ "cannot reject evidence for no reason or the wrong reason." Masher, 354 F. App'x at 627 (quoting Plummer, 186 F.3d at 429).  The ALJ gave no reasons for rejecting Dr. Jarmain's opinion about overhead reaching, aside from his own conclusion that the opinion was temporary.  Yet this reason does not withstand scrutiny given that Dr. Deutsch later also restricted Plaintiff to no overhead reaching, an opinion the Commissioner now characterizes as a "permanent" opinion.

110. Furthermore, "[i]n choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to [his] own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer, 186 F.3d at 429). Yet that is exactly what the ALJ did in tacitly rejecting Dr. Jarmain's opinions because he deemed them, without basis aside from his own speculation or lay opinion, merely temporary.

111. Remand is appropriate for the ALJ to properly address and weigh Dr. Jarmain's opinion regarding Plaintiff's inability to engage in any overhead reaching.  Should the ALJ choose to credit this opinion, which is consistent with that of

Dr. Deutsch, the RFC determination and subsequent analysis should be modified as necessary.[1]

### Dr. Cataldo and Dr. Tobe's Opinions

112. Plaintiff also argues that the ALJ's decision to give little weight to the opinions of Dr. Cataldo and Dr. Tobe is not supported by substantial evidence.  In particular, Plaintiff contends that the ALJ's decision to give these opinions little weight because their opinions were obtained "through attorney referral and in connection with an effort to generate evidence for the current appeal" [R. 34], is "inconsistent and arbitrary" in light of the fact that the opinions of other doctors, which the ALJ did not reject, were also procured by attorney referral. Plaintiffs also corrects the ALJ, noting that these assessments were obtained "for purposes of the pending workers' compensation litigation" not the social security appeal.  Pl. Br. at 22.

---

[1] The Court finds that the ALJ did not commit any harmful error in disregarding Dr. Jarmain's opinion that Plaintiff could lift no more than five pounds.  It is clear to this Court that the ALJ found this opinion to be inconsistent with Dr. Deutsch's opinion that Plaintiff could lift up to twenty pounds. Dr. Deutsch then cleared Plaintiff for work with no weight lifting restrictions.  Additionally, Plaintiff testified that she could lift at least eight pounds.  [R. 62-63].  The ALJ limited Plaintiff to light work, which is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b). The decision to reject Dr. Jarmain's opinion as to how much Plaintiff could lift is supported by substantial evidence, as the medical record as a whole is inconsistent with such a marked limitation.

113. The Commissioner counters that "the ALJ unquestionably evaluated both opinions, and he reasonably explained that the longitudinal record did not reflect impairments as limiting as were described by Dr. Cataldo or Dr. Tobe." Comm. Opp. Br. at 24. As to whether their opinions were procured as part of this appeal or Plaintiff's workers' compensation litigation, the Commissioner argues that "[e]ven to the extent the ALJ erred on such a point, however, the ALJ simply found that their opinions were inconsistent with the medical and other findings found throughout the entirety of the record . . . , which he walked through in his decision." Id. at 25.

114. The ALJ addressed the opinions as follows: "As to Dr. Cataldo and Dr. Tobe's opinions . . . , the undersigned gives these opinions little weight based on treating sources records and statements, the findings of Dr. Bagner, Dr. Paharia and Dr. Greenberg, as well as the claimant's reported activities of daily living to Dr. Greenberg . . . , which show that the claimant's impairments are not as limiting as was concluded by Dr. Cataldo and Dr. Tobe. The undersigned also notes that the claimant underwent these examination[s] that formed the basis of the opinions in question not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal. Further, the doctors were presumably paid for the

53

report.  Although such evidence is certainly legitimate and
deserves due consideration, the context in which it was produced
cannot be entirely ignored (SSR 96-2p)." [R. 34].

115. The ALJ gave little weight to the opinions of
Dr. Cataldo and Dr. Tobe because the opinions were inconsistent
with the medical record and Plaintiff's own reports of her
activities of daily life.  Plaintiff does not attack this
determination.  The ALJ acknowledged that it would be improper
to discard these opinions simply because they were obtained by
Plaintiff for litigation purposes and that the opinions were
"legitimate and deserve[d] due consideration." [R. 34].

116. The Court reiterates that it must uphold the ALJ's
finding if it is supported by substantial evidence, even if the
Court would have decided the inquiry differently. Fargnoli,
247 F.3d at 38.  Having reviewed the medical record and the
ALJ's explanation for his determination, the Court finds that
the ALJ's decision to give little weight to the opinions of
Dr. Cataldo and Dr. Tobe is supported by substantial evidence.
Remand is not appropriate on this issue.

### Dr. Mishra's Opinions

117. Lastly, Plaintiff argues that the ALJ "improperly
ignore[d] the Plaintiff's diagnoses of fibromyalgia, chronic
fatigue syndrome, and osteoarthritis as found by Dr. Mishra."
Pl. Br. at 23.  Plaintiff contends that the ALJ incorrectly

rejected Dr. Mishra's opinions as the product of a one-time evaluation that is uncorroborated by other medical evidence. Id. at 23-24.[2]

118. As to the treatment of Dr. Mishra's opinions, the Commissioner only responds that "Dr. Mishra's reference to Plaintiff's purported inability to function in her daily life was not even by its own terms an endorsement of functional limitations nor an opinion of her capacity to undertake a job; moreover, it merely related Plaintiff's subjective complaints." Comm. Opp. Br. at 27-28.  The Commissioner also points out that, "as the ALJ discussed," no other physician's findings supported the fibromyalgia diagnosis" made by Dr. Mishra.  Id. at 21.

119. In evaluating Dr. Mishra's opinions, the ALJ explained: "In May 2012, Dr. Mishra diagnosed the claimant with having fibromyalgia as she had 12 out of 18 tender points consistent with fibromyalgia . . . .  The undersigned notes that this was just a one-time examination and since then no other

---

[2] In passing, Plaintiff also contends that the ALJ ignored the opinions of Dr. Atlas and Dr. Polcer.  Pl. Br. at 21.  The ALJ does not address Dr. Atlas's findings or opinions in his decision.  While "[t]here is no requirement that the ALJ discuss in [his] opinion every tidbit of evidence included in the record," Hur, 94 F. App'x at 133, the ALJ must review and consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections." Burnett, 220 F.3d at 122.  On remand, the ALJ should address Dr. Atlas's findings and opinions and set forth the weight, if any, given to them. On remand, the ALJ should also consider Dr. Polcer's findings of radiculopathy, which are not addressed in the decision.

treating or examination physician has noted the claimant having symptoms consistent with fibromyalgia . . . ; therefore, the undersigned gives only some weight to Dr. Mishra's diagnosis . . . ." [R. 33].

120. The Court has addressed whether the ALJ properly evaluated Dr. Mishra's opinions more fully above, see supra at ¶¶ 93-101. The ALJ did not reject Dr. Mishra's opinions merely because they resulted from one evaluation. Rather, the ALJ properly weighed the entire medical record and found that Dr. Mishra's diagnosis of fibromyalgia was unsupported by and inconsistent with the medical record. Likewise, the ALJ evaluated the evidence of chronic fatigue and sleep disorder against Plaintiff's own reports of her activities of daily living and her statement to Dr. Mishra that she was feeling rested and sleeping well, and properly determined that the evidence did not support a finding of chronic fatigue or sleep disorder. Additionally, as the Court has already found, supra at ¶¶ 100-01, the ALJ properly evaluated Plaintiff's headaches and found that her treatment history was inconsistent with her reports of disabling pain and symptoms. Finally, the Court reiterates its finding that any error committed by the ALJ in not evaluating Dr. Mishra's diagnosis of osteoarthritis is harmless error and does not warrant reversal or remand. See supra at ¶ 99.

ACCORDINGLY, IT IS HEREBY on this **26th** day of **October 2016**,

**ORDERED** that the decision of the Administrative Law Judge

is **VACATED**, and the matter is **REMANDED** for further proceedings

consistent with this Memorandum Order; and it is further

**ORDERED** that the Clerk of the Court shall **CLOSE** the file in

the above-captioned matter.

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE